Good morning. Can you hear us okay, Judge Gibbons? I can hear you fine, however, I can't see you. The camera is on the part of the bench over to the left side where the chairs are empty. Let me ask the staff. Okay, now I've got a view of you. I can't see Judge Bush. Yeah, the camera is kind of trying to adjust to the people. Hang on a second. We'll see if the staff can adjust that. Bench camera test. Is it moving? No. Nothing? How about now? Now. Testing. Testing. I still just got Judge Clyde. Okay. What are you doing? Are you making further adjustments? Yes. Okay. There we go. Starting to get it. Well, now I can see Judge Bush, but I can't see Judge Clyde except for his arm. I'm trying to manually control the camera here a little bit. Judge Clyde? Yes. This was working last night, I promise. Camera test. Camera test. It's moving. It's moving slowly. I'm panning out. Working now? We have Judge Clyde's left arm. Testing. Testing. That's as good as it can get. Well, this time doesn't work, I guess. I'm pulling that camera. If you can't get it to run, I'll just muddle through that being able to save the judges. Testing. Testing. Testing. Is the camera moving? No. Anything? I'm trying to move it in here. Yep. It's the angle. Well, Judge Gibbons, if you're willing to just do the audio, I guess we can proceed. Yeah. Go right ahead. I mean, we'll just muddle through it. I do know if I can sit down, as a woman, and say give me that. Yeah. That's going to work fine, I think. Can you at least see counsel? Yes, I think so. If that's what you're willing to do. That's what I'm willing to do. Should you be counsel, just let me know. Testing from the podium? Yeah, that's good. Perfect. Okay. That's good. That's perfect. Okay. All right, please call the case. Case number 2021-89, New Hamilton Liquor Store, et al. versus Amgard Insurance Company. Oral argument not to exceed 15 minutes on the first side. Mr. Fulkerson for the audio. Good morning. Morning. I was notified by the clerk's office I can remove my mask for the purposes of argument. Yes. Please proceed. May it please the court. My name is Donald Fulkerson. I represent the plaintiff's appellants. Do we have some feedback here? By the way, Mr. Fulkerson, are you reserving time for rebuttal? Yes, Your Honor. Four minutes in my oral argument to acknowledge it. Okay. As the court's aware, this is the case involving whether or not a protective service endorsement was complied with by the plaintiff who operated a store in the Detroit area that was damaged by a fire. And the first issue for purposes of oral argument is just to do some housekeeping and to just reiterate or establish that the substantial compliance doctrine applies to whether or not the plaintiff satisfied the protective safeguard endorsement's condition. This is really, this is essentially now undisputed on appeal. In the trial court, Defendant Apley-Angard, their motion for summary judgment relied on the substantial compliance rule. And in their Apley brief, they also rely on it and don't dispute that this standard applies. So unless there's any questions on the substantial compliance issue, I'll move on. But I just submit that since the district court rejected reliance of the substantial compliance rule, for that portion of the district court's rule, it must be reversed. Well, you don't have a Michigan case that says that when there's an explicit contract, a written contract such as this, that circumstances such as we have here constitute what you refer to as substantial compliance. Do you have a case you're relying on for this? Well, Your Honor, this is a case of first impression both in Michigan and as far as I know in this circuit. However, national courts apply the substantial compliance rule to protective safeguard endorsements. And the district court took the position that Michigan follows the substantial compliance rule, but that compliance is narrowly limited to proofs of loss in insurance situations. But the district court was incorrect. As we've demonstrated in our brief, first of all, in the Westfield case, the Sixth Circuit just stated as a rule that Michigan follows the substantial compliance rule regarding insurance policies. And the district court's cases address only materially distinct and very specific mortgage and loan contracts, not insurance policies. And the district court also took the position, as I said, that the substantial compliance rule was only applicable to proofs of loss. But as we cite in our brief, it's also applicable in other situations in Michigan. It's applicable to notice issues. It's applicable to examinations under oath. And I cite national cases where the rule applies to protective safeguard endorsements in particular. And there's been no counterargument on this issue. So I think it's pretty firmly established that the substantial compliance rule would apply. It's not firmly established because you don't have a Michigan case you can cite for us. The problem is if you have not complied with, your client has not complied with the express terms of this written contract, it's sort of hard to say that what they did do constitutes substantial compliance that should result in being excused from policy provisions. If the provisions are expressed and not complied with, I'm not sure we have substantial compliance in Michigan. But even if we did, this wouldn't seem to be a suitable situation for that. Well, before we turn to the facts, I just want to point out another thing. Both in Michigan and nationally, whether or not a condition has been substantially complied with is generally considered a question of fact for the trial effect. And again, that's very clear, I think, in our brief. And that has not been disputed by AMGARD. But if you don't, we will talk about the facts. Well, that doesn't come into play here because it's not disputed as to whether you had the – well, I guess you are disputing it contrary to the express provisions of the contract. But what occurred factually is not disputed. So in terms of whether your client had a fire alarm that went to the police or to a private or public monitoring service, and it seems undisputed that your client did not have that. It had a burglar alarm and it had a different kind of alarm than was called for by the policy. So that – so you've got a problem in terms of whether you complied with the express policy provisions, don't you? No, Your Honor, I don't believe so. The policy only has three requirements for a fire alarm system. It must be automatic. This is undisputed in the case. It's undisputed that this was an automatic alarm system. But was it a dedicated fire alarm system is the issue. It functioned just like a fire alarm system. The district court relied on the fact that – in the district court's opinion, he talks about that there were sensors that were clustered in the district court's words around the front entrance. That is correct, but the sensors or what are actually called contacts around the entrance were not what we're talking about here. This is not just a burglar alarm system. This is a system that had a – that functioned also as a fire alarm system because it had infrared motion detectors spaced on opposite ends of the building that, according to AmGuard's own expert, Mr. Nowakowski, could detect and would alarm at both the motion and the radiating heat of the fire. So we have sensors in the building that were not just burglar alarm sensors. They were infrared motion and heat alarm sensors that functioned just like a fire alarm system. The trial court and Mr. Nowakowski argued that there had to be smoke detectors in the building, but that's not correct. That's not what the protective safeguard endorsement required. There's no requirement that there be a smoke alarm fire alarm system. There will only be just an automatic fire alarm system. And it is undisputed that this system detected the fire, sent an alarm to National, who is the central station, and it is undisputed that Central contacted the police. That is true, but the protective safeguard endorsement has options that gave the policyholder about how the system should function. It could either be, quote, connected to a central station with no other statement or reporting to a public or private fire station. So according to the policy itself, the reporting by National originally to the police did not disqualify this system from compliance, or at least substantial compliance, with the protective safeguard. What about an alarm sounding on the premises itself? This system did not have that, did it? That's correct, Your Honor. And you don't consider that to be part of required for an alarm to be substantially compliant with being a fire alarm? No, Your Honor, because under Michigan law, we're limited to the language of the agreement itself. Michigan has pretty strict rules regarding construction and enforcement of contract and insurance policy provisions. This protective safeguard endorsement had in bold definitions for the different devices that potentially could apply. And when you have a bold statement in bold thought, it is a defined provision. The protective safeguard endorsement has, for example, a definition of an automatic sprinkler system that has specifications laid out, or a security system that has specifications. It only requires that it be automatic, that it protect the entire building, and that it either be connected to a central station or report to a public or private fire station. This system did all of those things. There was no requirement of immediate direct reporting to a fire station. Go ahead, Your Honor. I have a copy of the alarm servicing agreement here. And the agreement has a checkoff for what's being provided. And it checks off burglar alarm. It checks off hold-up alarm. But it does not check off fire alarm. That's left blank. So they did not have this set up as a fire alarm. Isn't that pretty dispositive of all this? I don't believe it's dispositive, Your Honor. You are correct. Those are the terms of the original contract with National Alarm Company. But if it functioned just like a fire alarm system, an automatic fire alarm system, then that is the issue. It's not what title you put on it. And we asked the AMGARD corporate designee, the Rule 36B-6 designee, and we asked him, could this system be a compliant fire alarm system if it protected the entire building and it was connected to a central station? And he says, yes, it could be. And that was an admission by their own designee. Since the system was comprised of infrared motion detectors, and there's no requirement that there be smoke detectors, and their own expert admits that the infrared detectors detected the fire. This fire occurred 3.51 a.m. on the morning of the fire, August 26, 2016. Within three minutes, the fire department was notified. The police were immediately notified. And then the fire department was notified within less than a minute after that. They arrived on the scene in seven minutes. And according to Lieutenant Irwin of the fire department, the fire was knocked down and essentially controlled within 10 or 15 minutes. We had a system that worked. Once the police and fire department were not notified by a fire alarm, we don't have any evidence indication that they were alerted by a fire alarm connected to a central station or to a public or private fire alarm station, which is what the insurance policy requires. I'm not sure whether they were alerted by the movement in connection with the burglar alarm, if an arsonist was in there to set the fire, or somebody saw the flames. It's not clear if there was a phone call to the police. The police was, the records suggest the police was notified and then they called the fire department. Is that what happened? Yes. The central station notified the police, who immediately notified the fire department. And there was no intrusion into the main part of the building. None of the external contacts at the entrance alarmed. This was an interior alarm and it was, you would be correct if the building only had the contacts on the door. That would be an automatic burglar alarm system, but not function as an automatic fire alarm system, Your Honor. But the fact that this was an infrared motion and heat detection, heat and light detection system, and it signaled the central station motion, and the central station installed it and knew these were infrared detectors, it functioned as a fire alarm system and it substantially complied with the protective safeguard endorsement. I know I'm out of time. Any other questions? Apparently, apparently not. Thank you, Your Honor. Judge Gibbons? Yes. We're getting a little bit of feedback from your system. Could you turn it down just a little bit? No, no, I just wanted to read my mind. Okay. Is that better? Yes, yes, very much. Thank you. We'll hear from opposing counsel, Ms. Mitchum. Yes, thank you. Good morning, Your Honors. Good morning. Now I have to unsteam my glasses. Denise Mitchum, appearing on behalf of the AFLE, Amgard Insurance Company. First of all, Your Honors, I want to point out, we have not conceded any point that the plaintiff wants to make that substantial compliance is the standard. We address it later on in our brief because they raised it, and I did not want to let that issue go unbriefed. But the entire first part of my brief indicates that they have not complied with an express condition precedent. And as Your Honor has pointed out, there is no Michigan case law that allows them to apply the substantial compliance doctrine to an express condition precedent. That alone allows my client to not honor the terms of the contract in terms of paying any losses that arose from this. In fact, by making the argument in my brief and in oral arguments today that the burglary alarm was just like a fire alarm, that is an admission that they did not have a fire alarm on their system. They are not making any attempt to argue that there was actually a fire alarm in the system. As that was an express condition precedent, it bothers any recovery. I have a lot of information in my brief about why their burglar alarm did not satisfy the condition for a fire alarm. It was different in many ways. It was different in every way. If the court would like for me to go through those, I can, but I think it's well briefed. As the court has pointed out, the service agreement indicated that it was a burglar alarm. As we have indicated, the customer activity report showed that motion detectors were activated. My expert, Joseph Nowakowski, inspected the premises and said there was no fire alarm. He also testified that commonly, and for a business like this, a fire alarm would be a smoke detector. And the plaintiff's expert, Mr. Trinkle, Robert Trinkle, testified that the plaintiff admitted to him that he did not have a smoke detector on the premises. Now, if you go to, if you even get to the plaintiff's substantial compliance arguments, his entire argument in that regard relies very strongly upon the testimony of a non-expert, and that would be Robert Trinkle. Robert Trinkle is a cause and origin expert. That is not an issue in this case. There is no doubt that this was an arson fire. We did file a motion to disqualify him as a witness, which the judge did not get to in the lower court. However, we don't have to get that far for the argument, because the plaintiff has conceded, they have conceded, that Mr. Trinkle is not an expert as to alarm systems and as to fire alarm systems. It's in the record on page ID 2930. Plaintiff is acknowledging that Mr. Trinkle is not an alarm expert. We are not offering him as an alarm expert. He can only offer a low opinion regarding his perceptions and observations. On page ID number 2932, they say, again, Mr. Trinkle is not an expert as to alarm systems, and will not testify as such. Every argument that an appellant's attorney made here this morning about substantial compliance relied upon Mr. Trinkle talking about how it activated, when it activated, when the parties responded. He's not qualified to give any of that information, any of that opinion, by the appellant's own admission. But where we have to start and where the argument should really end is that substantial compliance does not apply. PSE says that it's conditioned precedent to coverage. There is no authority supporting the plaintiff's position with regard to the application of substantial compliance to protective safeguard. We don't need to show a causal connection between their breach of the conditioned precedent and the damages, although there's no doubt that the presence of a fire alarm is a material, the lack of a fire alarm is a material, causes a material risk of loss by fire. Does Michigan have any cases pertaining to this substantial compliance doctrine in these kinds of circumstances that you know about? No, I couldn't find a case on point in Michigan in that regard. The only case that we could find on point is a case that I believe the court referenced indicating that substantial compliance would be applied to proof of loss issues. But there is no case law supporting the plaintiff's position, the appellant's position. And the burden of proof is on the appellant. Are there any other questions? Apparently not. Thank you. We'll hear rebuttal if there is some. Thank you, Your Honor. I agree that AMGARD did not stipulate or specifically say we concede formally that the substantial compliance rule applies. What I've said in my argument today and what we said in our reply brief is there's no rebuttal. They present zero rebuttal to our argument that under Michigan and national law, the substantial compliance rule should apply. I point out that Ms. Mitchell talks about that this is an express condition. Under the Michigan cases applying the substantial compliance rule that apply it to notice issues and apply it to examinations under oath, those are also under insurance policies express conditions of coverage. The policies say we will not cover the loss unless you provide timely notice, unless you submit to an examination under oath. So I don't see how calling it an express condition supports the argument that there's somehow a distinction between a protective safeguard endorsement and other policy conditions that the insured must meet in order for there to be coverage. So this is still legally an unrebutted argument. And we have national cases that directly apply to this issue and apply the substantial compliance rule. What's your response to her argument regarding Robert Trinkle? She said that he was not an alarm expert. Do you agree? I agree that the claims indicated below they were not going to be presenting Trinkle specifically as an alarm expert. But he was a longstanding fire investigator who had a lot of experience examining scenes and examining the placement and the functioning of alarm systems. He can't tell you this is what this alarm system is, this is what that alarm system is, but he can say this is where the alarm system was located, this is how it functioned, and this is what happened afterward. And the district court did not strike Trinkle's testimony from the record in the opinion in order to grant him summary judgment. But more importantly, Judge Bush, my argument this morning did not rely at all on Trinkle. It relied on the defendant's expert, Mr. Nowakowski, who again admits these motion sensors were infrared, they detected the heat and the radiating energy and the motion of the fire, and he admits that. He admits that that was their design and he admits that that's what happened here. So to me it seems the issue boils down to, can this be a fire alarm system if instead of reporting the infrared motion, it should have said the word fire in the report to the central station. But the protective safeguard endorsement does not say, it only says connected to a central station. It does not say anything about what the substance of the reporting must be. And we have here again, it's almost like they're trying to argue a technicality. It detected the fire, it issued an immediate alarm, not just one but multiple redundant alarms inside the building when there was no building intrusion. The police department was immediately notified, the fire department was notified within three minutes of the first alarm and showed up within seven minutes of the first alarm and the fire was extinguished. You know, as the agreement says, as a condition of this insurance, you're required to maintain the protective devices or services listed in the schedule above. One of the things listed here is automatic fire alarm, protecting the entire building and then they say that is connected to a central station or reporting to a public or private fire station. So if I were to ask you if there was an automatic fire alarm in the building, you'd have to say no, wouldn't you? I would say that there was a system that was an automatic fire alarm system because it functioned exactly like an automatic fire alarm system. What system was that? It was the motion, infrared motion sensor system inside the building. But what alarm was that connected and what alarm did that pertain to? That was the burglar alarm, wasn't it? It was the alarm system, it was called a burglar alarm system in the original agreement. But there's nothing in the protective safeguard endorsement that precluded the policyholder from having a dual function system. It could be a burglar alarm system that also functioned as a fire alarm system. But this was not a dual system, this was the burglar alarm system, right? I disagree, Your Honor. If you want to say because the contract had the term burglar and hold up alarm, therefore it is determinative, we're not going to go any farther without considering the evidence of what was the actual system and how did it function, then you're right. The contract says burglar and hold up alarm. However, you have to look at, I respectfully assert, you have to look at how the system functioned. And no one expert admits this, it did everything, it detected the fire and it issued an alarm. And if you apply the terms of the protective safeguard endorsement as written without adding anything, then... I wanted to wrap up, Counselor. Don't go to a new point, if you want to wrap that up, you can. One final point. AMGARD is free to rewrite the protective safeguard endorsement, but we have to apply under Michigan law the endorsement as written. All right, I think we have your argument in hand and we thank you for your arguments and we appreciate the arguments of both Counselors. Thank you. The case will be taken under advisement and court may be adjourned.